UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JASON LANELLE TOWNSEND,

                Petitioner,

v.

BRYAN MORRISON,

                Respondent.

_____/

Case No. 1:23-cv-1371

Honorable Jane M. Beckering

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jason Lanelle Townsend is incarcerated with the Michigan Department of Corrections at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan. On July 13, 2017, following a three-day jury trial in the Ingham County Circuit Court, Petitioner was convicted of first-degree criminal sexual conduct, in violation of Mich. Comp. Laws § 750.520b(1)(f). On August 16, 2017, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to a prison term of 25 to 50 years.

On December 26, 2023, Petitioner filed his habeas corpus petition, raising the following three grounds for relief:

    I.      Petitioner was deprived of his constitutional right to a fundamentally fair trial where he was the victim of judicial bias from the trial judge and juror partiality from a sitting juror requiring a new trial. US Const. Amends. VI and XIV.

    II.     Petitioner is entitled to a new trial where his trial attorney was constitutionally defective and his appellate attorney was deficient for failing to raise the claim against the trial attorney's failure to fully investigate the case and assert a valid defense to the charge of rape where evidence supported his defense of actual innocence.

III.    Petitioner is entitled to relief where his conviction, based on the facts of the case, demonstrates his actual innocence and but for the Sixth Amendment violations of judicial bias and ineffective assistance of counsel, no juror would have voted to convict him of criminal sexual conduct amounting to rape.

(§ 2254 Pet., ECF No. 1, PageID.5.) Respondent contends that Petitioner's § 2254 petition is meritless.[1] (ECF No. 6.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

## I.    Factual Allegations and Procedural History

The Michigan Court of Appeals described the events underlying Petitioner's conviction as follows:

> This case arises from [Petitioner's] nonconsensual anal penetration of the victim, with whom [Petitioner] was having a consensual sexual relationship. The victim and [Petitioner] initially met on social media and developed a relationship that the victim described as "friends with benefits." By contrast, [Petitioner] described the relationship as sexual only, not a friendship. They agree that they had sexual relations on about seven occasions at the victim's home, but were not dating.

---

[1] Respondent also argues that Petitioner's second ground for relief is partially procedurally defaulted, and that his third ground for relief is procedurally defaulted. (ECF No. 6, PageID.118.) Respondent recognizes, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

On October 27, 2016, [Petitioner] and two friends went to the victim's place of employment to apply for jobs. He testified that it was his understanding that the victim had agreed to assist him with getting a job there. The two agreed to meet at her home after the victim was done with work. The victim testified that the purpose of the meeting was to have sex. [Petitioner] testified that he did not know the purpose of the meeting, and also testified that he thought the purpose to talk about his job application, but agreed that the only reason he had gone to the victim's home in the past was to have sex with her. [Petitioner] also testified that the encounter was "supposed to be a quickie" because someone was waiting for him in the car.

When [Petitioner] arrived, he and the victim engaged in consensual oral and vaginal intercourse. According to the victim, [Petitioner] then tried to put his penis into her anus and she told him "no." The victim testified at trial that despite her protests, defendant forcibly held her down and penetrated her anus with his penis for about three minutes. By contrast, [Petitioner] testified that after they had had consensual oral and vaginal sex, he was preparing to leave when the victim suggested anal sex. He admitted that during the anal sex the victim said "don't" and "stop," but he believed that it was part of role-playing that they were engaging in, and so did not stop. Afterward, [Petitioner] left. The victim discovered that she was bleeding from her anus and arranged transportation to the hospital, where it was confirmed that she had suffered injuries from forced trauma. Subsequent analysis of swabs taken of the victim's vaginal and anal areas during the physical examination confirmed the presence of [Petitioner's] DNA. [Petitioner] was charged with first-degree criminal sexual conduct.

Unbeknownst to [Petitioner], the victim made an audio recording with her telephone of their sexual encounter. She testified that she had previously made similar audio recordings of her sexual encounters with [Petitioner] and with other men. At trial, the audio recording was played for the jury and [Petitioner] admitted that the recording does not include any indication that the victim suggested or agreed to anal sex. [Petitioner] sought to introduce evidence of prior sexual conduct with the victim involving digital-anal penetration and also evidence of prior role-playing in the relationship as part of his consent defense. The trial court denied [Petitioner's] request, reasoning that the evidence was not relevant to the charged offense.

[Petitioner] admitted at trial that he had lied to the investigating detective during the investigation about whether he had engaged in anal sex with the victim. After re-direct examination, the trial court questioned [Petitioner] further about the reason for his lies. Afterward, [Petitioner] moved for a mistrial, arguing that the trial court's questioning, together with a comment made regarding defense counsel, demonstrated judicial bias. The trial court denied the motion, and the jury found [Petitioner] guilty.

*People v. Townsend*, No. 339909, 2018 WL 6815958, at *1–2 (Mich. Ct. App. Dec. 27, 2018).

Jury selection for Petitioner's trial occurred on July 10, 2017. (Trial Tr. I, ECF No. 7-8.) Over the course of July 10 and 11, 2017, the jury heard testimony from numerous witnesses, including the victim, the victim's cousin, a friend of the victim, law enforcement officers, a sexual assault nurse examiner, a forensic scientist from the Michigan State Police's forensic lab in Lansing, Petitioner himself, and one of Petitioner's friends and coworkers. (Trial Tr. I and II, ECF Nos. 7-8, 7-10.) On July 13, 2017, after less than an hour of deliberation, the jury returned a guilty verdict. (Trial Tr. III, ECF No. 7-11, PageID.391.) Petitioner appeared before the trial court for sentencing on August 16, 2017. (ECF No. 7-12.)

Petitioner, with the assistance of counsel, appealed his conviction and sentence to the Michigan Court of Appeals, asserting the following claims for relief: (1) the trial court erred by denying Petitioner's motion for a mistrial because the trial court demonstrated judicial bias by demeaning Petitioner's attorney and expressing skepticism about Petitioner's credibility; (2) the recorded conversation between Petitioner and the victim was obtained illegally and should have been suppressed; and (3) the trial court erred by denying Petitioner's motion in limine to admit evidence of prior sexual conduct between Petitioner and the victim. (ECF No. 7-16, PageID.529.) Petitioner attempted to file a *pro per* supplemental brief, but that brief was returned to him because the court of appeals had denied Petitioner's motion for an extension of time to file such a brief. (*Id.*, PageID.520–523.) On December 28, 2018, the court of appeals affirmed Petitioner's conviction and sentence. *Townsend*, 2018 WL 6815958, at *8. The Michigan Supreme Court denied Petitioner's *pro per* application for leave to appeal on July 2, 2019. *See People v. Townsend*, 929 N.W.2d 366 (Mich. 2019).

4

On May 8, 2020, Petitioner returned to the trial court and filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500. (ECF No. 7-13.) Petitioner raised the following grounds for relief in that motion: (1) appellate counsel was ineffective for committing fraud upon the court; (2) appellate counsel was ineffective for failing to raise the trial court's failure to control proceedings when exculpatory defense testimony was excluded; (3) appellate counsel was ineffective for failing to argue that the trial court invaded the province of the jury by exhibiting disbelief regarding Petitioner's testimony; (4) appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to file a motion to suppress the recorded conversation; (5) appellate counsel was ineffective for failing to challenge the trial court's refusal to remove two jurors who were victims of sexual assault and expressed a potential bias; and (6) Petitioner's due process rights were violated when the court of appeals unreasonably reviewed Petitioner's claim regarding the denial of his motion in limine regarding prior acts. (*Id.*, PageID.399–401.) On July 18, 2020, Petitioner filed a second Rule 6.500 motion, raising a freestanding claim of actual innocence. (ECF No. 7-14.)

On March 21, 2022, the trial court issued an opinion and order denying Petitioner's second Rule 6.500 motion raising his actual innocence claim. (ECF No. 7-15.) It does not appear that the trial court ever addressed the Rule 6.500 motion filed on May 8, 2020. The Michigan Court of Appeals denied Petitioner's delayed application for leave to appeal on March 14, 2023. (ECF No. 7-18, PageID.653.) The Michigan Supreme Court denied Petitioner's application for leave to appeal on August 22, 2023. *See People v. Townsend*, 993 N.W.2d 853 (Mich. 2023). This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in

6

light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate

courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Discussion

### A.    Ground I—Judicial Bias and Juror Partiality

As his first ground for relief, Petitioner contends that he was deprived of a fair trial, in violation of his Sixth and Fourteenth Amendment rights, "where he was the victim of judicial bias from the trial judge and bias partiality from sitting jurors." (§ 2254 Pet., ECF No. 1, PageID.5.)

#### 1.    Judicial Bias

Petitioner first contends that "the trial judge in his jury trial pierced the veil of judicial impartiality and violated his constitutional guarantee to a fair and impartial judge." (§ 2254 Pet.,

ECF No. 1, PageID.17.) Petitioner first contends that the trial judge did so when he "ignored [his] former ruling and infringed on Petitioner's right to assert a valid defense to the charge of criminal sexual conduct (rape) when he chose to testify on his own behalf." (*Id.*) Petitioner indicates that prior to trial, the judge ruled that he would allow certain evidence "regarding the defense of 'role playing' during the sexual acts." (*Id.*)

Petitioner goes on to suggest that judicial bias was apparent when the trial judge made a comment to the jury regarding defense counsel's "questioning of Detective Jodie McGuire about the difficulty of hearing part of the taped recording." (*Id.*) He asserts that the judge displayed bias again during "the exchange between Petitioner and his defense attorney, when she was questioning him regarding the taped version of the sexual act." (*Id.*) According to Petitioner, the trial judge "took the role as a prosecutor in his questioning which berated Petitioner and his defense counsel in front of the jury." (*Id.*)

Petitioner acknowledges that he raised his judicial bias claim on direct appeal. (*Id.*, PageID.18.) He suggests, however, that the court of appeals' rejection of his claim was contrary to, and an unreasonable application of, clearly established federal law because the court of appeals made no mention "of the Sixth Amendment's guarantee of a right to have an impartial judge in a trial by jury." (*Id.*) Moreover, Petitioner appears to suggest that the trial judge displayed actual judicial bias, which amounts to structural error. (*Id.*, PageID.16.)

Petitioner is correct that ***actual*** judicial bias amounts to structural error that is not susceptible to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927) (holding that a judge with a direct, personal, substantial pecuniary interest in reach a conclusion against [the criminal defendant] in his case" was constitutionally disqualified)); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (same); *Bracy*

*v. Gramley*, 520 U.S. 899, 904–905 (1997) (stating that "the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no ***actual*** bias against the defendant or interest in the outcome of his particular case." (citations omitted, emphasis added)). But many circumstances that lead a criminal defendant to question a judge's impartiality do not involve "actual bias:"

> [M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S.Ct. 1580, 1588–1589, 89 L.Ed.2d 823 (1986). Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. *See, e.g., Aetna, id.*, at 820–821, 106 S.Ct., at 1584–1585; *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927); 28 U.S.C. §§ 144, 455; ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980)

*Bracy*, 520 U.S. at 904.

A judge's conduct at trial may be "characterized as 'bias' or 'prejudice'" only if "it is so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994). However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016) (internal quotation marks omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009) ("The difficulties of inquiring into actual bias . . . simply underscore the need for objective rules.").

The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. at 523; (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the

contemnor," *Offut v. United States*, 348 U.S. 11, 17 (1954); *see also Taylor v. Hayes*, 418 U.S. 488 (1974); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 579 U.S. at 8. Beyond that, the courts indulge "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). As the Sixth Circuit has noted:

> The presumption of impartiality stems not merely from the judicial-bias caselaw, *see* [*Withrow*], but from the more generally applicable presumption that judges know the law and apply it in making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997), and the even more generally applicable presumption of regularity, *see Parke v. Raley*, 506 U.S. 20, 30–31 (1992); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

*Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013).

Petitioner's bias claim does not implicate the indicia of bias set forth in *Tumey*, *Offut*, and *Williams*. Nothing in the record suggests that the trial judge had a pecuniary interest in Petitioner's case, that the trial judge became embroiled with Petitioner, and that the judge had prior involvement in the matter as a prosecutor. Rather, Petitioner characterizes his claim as a situation where the trial judge's conduct "suggested to the jury that defense counsel was dishonest and Petitioner was lying." (§ 2254 Pet., ECF No. 1, PageID.18.) He appears to argue that the type of bias displayed by the trial judge is akin to the type of bias the Supreme Court defined in *Liteky*.

The petitioners in *Liteky* had been charged with willful destruction of United States property. *Id.* at 542. Prior to trial, they moved to disqualify the judge based upon "events that had occurred during and immediately after an earlier trial, involving petitioner Bourgeois, before the same District Judge." *Id.* Specifically, the petitioners argued that, during that earlier case,

> the judge had displayed "impatience, disregard for the defense and animosity" toward Bourgeois, Bourgeois' codefendants, and their beliefs. The alleged evidence of that included the following words and acts by the judge: stating at the outset of the trial that its purpose was to try a criminal case and not to provide a political

forum; observing after Bourgeois' opening statement (which described the purpose of his protest) that the statement ought to have been directed toward the anticipated evidentiary showing; limiting defense counsel's cross-examination; questioning witnesses; periodically cautioning defense counsel to confine his questions to issues material to trial; similarly admonishing witnesses to keep answers responsive to actual questions directed to material issues; admonishing Bourgeois that closing argument was not a time for "making a speech" in a "political forum"; and giving Bourgeois what petitioners considered to be an excessive sentence. The final asserted ground for disqualification—and the one that counsel for petitioners described at oral argument as the most serious—was the judge's interruption of the closing argument of one of Bourgeois' codefendants, instructing him to cease the introduction of new facts, and to restrict himself to discussion of evidence already presented.

*Id.* at 542–43.

The Supreme Court rejected the petitioners' arguments that the judge should have recused himself. In its analysis, the Court noted that "[t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Id.* at 550–51. The Court cautioned, however, that "the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." *Id.* at 551. The Court then set forth the showing petitioners needed to make to succeed on a judicial bias claim:

First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S. [563, 583 (1966)]. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality

challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555–56 (emphasis in original).[2] Overall, the Court concluded, the comments made by the judge during the prior proceeding did not "display[] deep-seated and unequivocal antagonism that would render fair judgment impossible." *Id.* at 556.

Notably, in *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008), the Sixth Circuit conducted an exhaustive analysis of Supreme Court precedent governing judicial bias. *See id.* at 393–407. The Sixth Circuit provided the following summary following its analysis:

In sum, one *could* read the Supreme Court precedent in this area as holding that the probability of bias—based on a likelihood or appearance of bias—can be sufficient to disqualify a judge and violate a party's constitutional right to due process. But, one *could also* read these cases as holding that, other than in cases of contempt arising in a closed (secret) hearing, only actual bias or pecuniary-interest-based probability is sufficient—and, moreover, that a matter of mere kinship has, as of yet, never been acknowledged as a sufficiently biasing interest. Regardless of the preferred reading—or the merits of one reading over the other—the fact that there are two or more reasonable readings compels the conclusion that this precedent is not "clearly established."

---

[2] *Liteky* is a case that addresses the statutory recusal standard for federal judges. The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause. *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

13

*Id.* at 407.

The Sixth Circuit has further noted that judicial bias may be established when "the judge's remarks clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the [c]ourt with one of the parties." *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (internal quotation marks and citations omitted). Moreover, a judge may commit misconduct when he "abandons his proper rule and assumes [the role] of [an] advocate" when questioning a witness. *Id.* (alteration in original). The Sixth Circuit has set forth the following considerations when analyzing a claim of judicial misconduct or bias: "(1) 'the nature of the issues at trial,' including how lengthy and complex the trial is; (2) 'the conduct of counsel,' and whether the attorneys are 'unprepared or obstreperous,'; and (3) 'the conduct of witnesses.'" *United States v. Smith*, 706 F. App'x 241, 254 (6th Cir. 2017) (quoting *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979). Moreover, the Sixth Circuit "has considered the tone of the judicial interruptions, the extent to which they were directed at one side more than the other, and the presence of any curative instructions at the close of the proceedings." *McMillian v. Castro*, 405 F.3d 405, 410 (6th Cir. 2005). "[T]he rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover." *United States v. Martin,* 189 F.3d 547, 554 (7th Cir. 1999).[3]

---

[3] The Court recognizes that decisions from the circuit courts do not constitute clearly established federal law for purposes of AEDPA. *See Parker v. Matthews*, 567 U.S. 37, 48 (2012). However, these decisions provide insight into the factors that appellate courts take into consideration when analyzing a defendant's claim regarding judicial bias.

The court of appeals addressed Petitioner's judicial bias claim in a thorough discussion. Petitioner is correct that the court of appeals addressed his claim under state law principles. *See Townsend*, 2018 WL 6815958, at *2. Specifically, the court of appeals set forth the following standards:

> "Due process requires that an unbiased and impartial decision-maker hear and decide a case." *Kern v. Kern-Koskela*, 320 Mich. App. 212, 231, 905 N.W.2d 453 (2017) (quotation marks and citation omitted). A trial judge is presumed to be fair and impartial, however, and a party claiming judicial bias must overcome "a heavy presumption of judicial impartiality." *People v. Biddles*, 316 Mich. App. 148, 152, 896 N.W.2d 461 (2016) (citation omitted). A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. *Stevens*, 498 Mich. at 170, 869 N.W.2d 233. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id.* at 171, 869 N.W.2d 233. Whether the trial court pierced the veil of judicial impartiality is a "fact-specific analysis" that must be determined by considering the totality of the circumstances. *Id.* at 171–172, 869 N.W.2d 233. We do not apply a harmless error analysis to a claim of judicial partiality, and instead determine "whether the judge's conduct improperly influenced the jury without considering the weight of the evidence presented against the aggrieved party or whether the conduct *actually* contributed to the jury's verdict." *Id.* at 171, 869 N.W.2d 233 n. 3.
>
> To determine whether a trial judge pierced the veil of judicial impartiality, we consider "a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions," as well as any other relevant factors. *Id.* at 172, 869 N.W.2d 233. Judicial misconduct may include "belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id.* at 172–173, 869 N.W.2d 233.
>
> * * *
>
> MRE 614(b) permits the trial court to question witnesses called by itself or by a party. Judicial questioning has boundaries, however. *Stevens*, 498 Mich. at 174, 869 N.W.2d 233. "It is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally," and judges "should avoid questions that are

15

> intimidating, argumentative, or skeptical." *Id.* at 174–175, 869 N.W.2d 233. A trial judge demonstrates partiality when he undermines a party's witness and implies that he has his own opinions about witness credibility. See *id.* at 180–183, 869 N.W.2d 233. When the tone and demeanor of the trial court apparent in the lower court record is hostile to a defendant's witness or demonstrates partiality, that fact weighs in favor of granting the defendant a new trial. *Id.* at 187, 869 N.W.2d 233.

*Townsend*, 2018 WL 6815958, at *2, 4. Although the court of appeals cited state law for the standard, the standard set forth is substantially identical to the federal standards set forth above. This Court, therefore, cannot agree with Petitioner that the court of appeals' decision is contrary to clearly established federal law. Petitioner, therefore, is entitled to relief only if he can show that the court of appeals' decision constitutes an unreasonable application of the law.

The court of appeals then applied the standard and rejected Petitioner's judicial bias claim. First, the court of appeals addressed Petitioner's arguments regarding the trial judge's comment to the jury, stating:

> In this case, [Petitioner] argues that the trial court demonstrated partiality by berating defense counsel during trial within the hearing of the jury in a way that suggested that counsel was dishonest and using deceptive tactics. [Petitioner] argues this occurred when the trial court stated:
>
>> I want to advise the jury that if either attorney felt that there were items that were unclear on anything, they would have a right to copies[,] they had to have them transcribed by someone they chose and then to have those provided. So to sit here and say that they couldn't hear something is rather disingenuous since those options are always available and the Court provides resources if needed.
>
> [Petitioner] argues that the trial court made this comment to the jury in response to defense counsel's questioning of a detective regarding the audio recording:
>
>> *Defense Counsel*. Okay. You have had an opportunity to listen to the recording from [the victim's] phone prior to yesterday's court hearing?
>
>> *Detective*. Yes.
>
>> *Defense Counsel*. Okay. And there is [sic] things on that recording that are sort of in the background, maybe hard to hear in this setting?

*Detective*. Possibly.

*Defense Counsel*. Okay. Would you — such as, like words that were said would be easier to hear if you weren't in a big room like this and the circumstances we are listening?

*Detective*. Yes.

*Defense Counsel*. Okay. And on that recording, it's about a minute or so in before we hear actual sex begin, would you agree with that?

*Detective*. Yes.

*Defense Counsel*. Okay. So—and at the end of the recording you can hear a little bit of conversation after the sex ends?

*Detective*. Yes.

*Defense Counsel*. And at the very end you can actually hear the voices get very far from —

*ASSISTANT PROSECUTOR*: Judge, I am going to object to asking the witness to interpret the piece of evidence. It is an exhibit and it's available for the jury to —

*THE COURT*: What exactly is the point of these questions?

*Defense Counsel*: Just to point out areas of the recording that maybe would be better heard by listening closer to it.

*THE COURT*: I see. Objection sustained.

[Petitioner] later moved for a mistrial on the basis that the trial court's statement displayed partiality. In ruling on the motion outside the hearing of the jury, the court indicated its reasoning:

Now, as for your other comment, you continuously use—well, where is this piece of evidence you didn't give me, when you have it in your hands. You could use whatever techniques you wish to try to ferret out additional commentary that may have been on those tapes. Instead, you don't do that. You sit back and make and pretend like they are doing something bad. All I said is you have the right to do the same things they had and you had an opportunity to see that evidence. I don't think that's improper.

We disagree that the comment to the jury was a suggestion by the trial court that defense counsel was dishonest or deceptive. A review of the record indicates that defense counsel had suggested that the recording was incomplete. During her

17

opening statement, defense counsel asked, "[W]as the recording altered in any way? And if so, why? Is everything there? Are we hearing everything?" Nor was the comment directed at defense counsel alone. The record indicates that the prosecutor, who also apparently was concerned about whether the jury could properly hear the recording when it was played, had been admonished by the trial court for adjusting the volume without the court's consent.

The trial court's comment was directed to "either counsel" and indicated that both attorneys had the evidence available to them and nothing precluded either of them from analyzing the data or transcribing any parts of the audio either side considered hard to hear. The trial court's comment was an apt clarification to the jury that neither party had been deprived of the complete audio recording, and the singular use of the word "disingenuous" in this context was not so egregious as to pierce the veil of judicial impartiality. Considering the nature and tone of the comment, the brevity of the comment, and that the comment referenced both counsel, we conclude that the comments, taken as a whole, did not pierce the veil of judicial impartiality.

*Townsend*, 2018 WL 6815958, at *3–4.

Upon consideration of the foregoing, and given the facts here, the Court cannot say that the court of appeals' conclusions regarding the trial judge's comment to the jury is contrary to, or an unreasonable application of, clearly established federal law. Contrary to Petitioner's assertion, it does not appear that the trial judge "berated" defense counsel during this exchange. Furthermore, during preliminary jury instructions, the trial judge informed the jury that "[n]othing I say is meant to reflect my own opinions about the facts of the case." (Trial Tr. I, ECF No. 7-8, PageID.297.) The trial judge reiterated this assertion during final jury instructions, stating:

Now, my comments, rulings, questions and instructions are also not evidence. I have a duty to see that this trial is conducted according to the law and to tell you the law that applies to this matter. However, when I am making a comment, ask a question or give an instruction, I am not trying to influence your vote or express any personal opinion about the case. If you believe that I have some opinion about how you should decide the matter, you must pay no attention to that opinion. You are the judges of our facts and you should decide the case from the evidence presented.

18

(Trial Tr. III, ECF No. 7-11, PageID.387.) As set forth above, the court of appeals acknowledged that any curative instructions given are relevant to determining whether actual judicial bias exists. Clearly established federal law sets forth that jurors are presumed to follow their instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *cf. United States v. Barnhart*, 599 F.3d 737, 746 (7th Cir. 2010) (noting that such an instruction "limits the degree of influence the questions might otherwise have on the jury's deliberations and may permit a conclusion that the judge's error was not prejudicial").

The court of appeals then addressed Petitioner's claim that "the trial court questioned him in a manner that suggested he was not credible and that there was something wrong with [Petitioner] 'lawyering up.'" *Townsend*, 2018 WL 6815958, at *4. Specifically, the court of appeals stated:

> In this case, [Petitioner] admitted during his testimony that he was asked three times by the investigating detective about whether he had anal intercourse with the victim and lied each time. On direct examination, [Petitioner] explained why he had lied to the detective, stating:
>
> > Detective McGuire, she was untruthful to me when she told me that I never gave her my address and invited her to my home to talk to me about what issues she wanted to do the investigation about, and I felt I had probably said too much. She wasn't going to be truthful. It was not going to get me home no time soon. So instead of asking for an attorney—and I had not had my free phone call or was able to use the phone to call an attorney or to call my relatives. Now I am shutting down.
>
> On re-direct examination, when asked why he had continued to lie, [Petitioner] answered:
>
> > I didn't want to lawyer up and ask for my attorney. I wanted to hear what I was being charged with. I have never thought that I would be charged with something like this for something that I did not do, and I wanted to hear what she had to say.
>
> After re-direct examination, the trial court questioned [Petitioner] further on this point:

19

*The Court*. Sir, let me just ask you, you say you didn't want to lawyer up?

*Defendant*. I did not want to ask for an attorney at the time.

*The Court*. Okay. You didn't want to lawyer up then? That's what that means, isn't it?

*Defendant*. Right.

*The Court*. Okay. Didn't you tell that detective that you had a lawyer on the way down there?

*Defendant*. I did tell her I had an attorney on the way down. However, I did not want to ask for my attorney to be present because I was not planning on making a statement.

*The Court*: You had a lawyer on the way down to lawyer up?

*Defendant*: Correct.

*The Court*. So I don't understand when you say you didn't want to lawyer up when you were lawyering up, sir?

*Defendant*. Okay. I had not talked to my relatives. I knew that I would have an attorney coming. I had not talked to anybody. I had not had a legal representation coming.

*The Court*. That isn't what I asked you. You told me—or you told us that you were lying to the officer because you didn't want to lawyer up, when, in fact, you knew you had a lawyer on the way down there. I don't understand how your family has anything to do with it. You knew the lawyer was coming.

*Defendant*. Because I had talked to my mom when I got arrested. The officer allowed me to call my mother.

*The Court*. So you did talk to your mother?

*Defendant*. I talked to my mom, but I had not talked to her once I hit the county jail.

*The Court.* I see, but you had had phone calls?

*The Defendant*. I had one call prior to getting to the county jail.

*The Court*. Okay. Thank you. Any other questions based on that?

20

It is evident that the trial court was questioning [Petitioner] to clarify his testimony. [Petitioner's] testimony was unclear; he testified that he lied to the detective because he did not want to "lawyer up" at that time. Upon further questioning by the trial court, [Petitioner] confirmed that he had, in fact, already sought an attorney who was on his way to the interrogation, and so he had already effectively "lawyered up." Contrary to [Petitioner's] assertion, there is no indication that the trial court disparaged him for requesting counsel. The trial court's questioning seems to have been directed toward clarifying [Petitioner's] rather confusing assertion that he lied because he did not want to request an attorney, particularly given [Petitioner's] admission that he was aware an attorney was on the way and given that the events of lying and requesting an attorney would normally seem to bear little relationship to one another. We further note that, again, the trial court's questioning of [Petitioner] was limited in duration and scope. We conclude that the trial court's questioning of [Petitioner] did not exceed the scope of permissible judicial questioning. *See People v. McDonald*, 303 Mich. App. 424, 437, 844 N.W.2d 168 (2013). We therefore find that the trial court did not abuse its discretion by denying [Petitioner's] motion for mistrial.

*Townsend*, 2018 WL 6815958, at *4–5.

Again, the Court cannot say that the court of appeals' conclusion regarding the trial court's questioning of Petitioner are contrary to, or an unreasonable application of, clearly established federal law. Petitioner offers nothing beyond the arguments that were raised and rejected on direct appeal. Notably, the Supreme Court has never held that the manner in which a judge questions a defendant is so indicative of actual bias that it rises to the level of judicial bias that qualifies as structural error. *See Elizondo v. Bauman*, 674 F. App'x 561, 562 (6th Cir. 2007) (noting that "no United States Supreme Court holding supports Petitioner's claim of judicial bias flowing from a judge's interrogation of a criminal defendant at trial"); *see also Bassett v. Horton*, No. 17-1786, 2017 WL 6820126, at *2 (6th Cir. Nov. 30, 2017) (rejecting habeas petitioner's judicial bias claim because the judge's questioning of prosecution witnesses, even if extensive, did not "reflect the degree of bias or partiality required to trigger any due process concerns"). Moreover, as set forth above, the trial judge explicitly directed the jury that his comments and questions were not

21

evidence and were not intended to influence the jury, and jurors are presumed to follow their instructions. *See Weeks*, 528 U.S. at 234.

In sum, Petitioner has not demonstrated that the court of appeals' rejection of his judicial bias claim is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to this aspect of habeas ground I.

### 2. Juror Partiality

Petitioner next takes issue with the fact that two jurors, Jurors #4 and #11, were allowed to remain "on the panel despite their having been victims of a sexual assault." (§ 2254 Pet., ECF No. 1, PageID.21.) Petitioner asserts that these jurors "expressed uncertainty about their ability to judge impartial[ly] which gave rise to a challenge for cause." (*Id.*) He contends that his Sixth Amendment right to an impartial jury was violated because these two individuals were still allowed to serve as jurors. (*Id.*) Petitioner raised this claim as part of a claim of ineffective assistance of appellate counsel in his May 8, 2020 Rule 6.500 motion, but, as noted above, the trial court never addressed the merits of this claim. The Court, therefore, will undertake a *de novo* review of Petitioner's claim. *See Stermer*, 959 F.3d at 721 (citing *Maples*, 340 F.3d at 436).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury" U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471–72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).

22

"The voir dire is designed 'to protect [this right] by exposing possible biases, both known and unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). Voir dire plays an important role in ensuring the impartiality of the jury selected:

> It is true that "[v]oir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). The Constitution, after all, does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171–172 (1950*); Morford v. United States*, 339 U.S. 258, 259 (1950). "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

*Morgan*, 504 U.S. at 729–30 (parallel citations and footnote omitted).

Jurors are presumed to be impartial. *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citing *Irvin*, 366 U.S. at 723). When a juror's impartiality is called into question, the relevant issue is "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)); *see also Miller v. Webb*, 385 F.3d 666, 673 (6th Cir. 2004). The trial court must determine whether the juror demonstrates "actual bias"; that is, "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Miller*, 385 F.3d at 673–74 (internal quotation marks omitted). "A juror's express doubt as to her own impartiality on voir dire does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on voir dire." *Hughes v. United*

23

*States*, 258 F.3d 453, 458 (6th Cir. 2001) (citing *Patton*, 467 U.S. at 1032). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. In evaluating the juror's ability to lay aside partiality, the Sixth Circuit has identified a number of important factors, including the following: "the juror's own estimation of the relevance of [the information giving rise to her partiality]; any express indications of partiality by [the] juror . . . and the steps taken by the trial court in neutralizing this information." *Hughes*, 258 F.3d at 459 (quoting *Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000)).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis*, 354 F.3d at 520 (citing *Patton*, 467 U.S. at 1036); *see also Sizemore v. Fletcher*, 921 F.2d 667, 672–73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)). Petitioner bears the burden to establish the existence of juror bias which caused him to suffer actual prejudice. *See Smith*, 455 U.S. at 215–17 (stating that petitioner bears the burden to demonstrate that he suffered "actual bias" as a result of juror misconduct); *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000); *Sheppard v. Bagley*, 657 F.3d 338, 348–49 (6th Cir. 2011) (Batchelder, J., concurring).

At the beginning of voir dire, the prosecutor asked the prospective jurors if any of them had been a victim of criminal sexual conduct or knew someone who had been accused of such conduct. (Trial Tr. I, ECF No. 7-8, PageID.270.) Jurors #2, #4, #11, and #13 raised their hands. (*Id.*) As noted above, Petitioner takes issue with the fact that Jurors #4 and #11 were allowed to remain on the panel.

During voir dire, Juror #4 indicated that she had been a victim of criminal sexual conduct that "ended, like, three years ago." (*Id.*) When the prosecutor asked "how is that affecting you sitting here knowing that that's what this case is about," Juror #4 responded, "I am calming down."

24

(*Id.*) When the prosecutor asked Juror #4 if she would "be able to listen to the evidence and render a verdict based on the evidence in this case," Juror #4 responded, "Yes." (*Id.*)

Juror #11 indicated that she dealt with sexual abuse as part of her profession as a teacher. (*Id.*, PageID.271.) When the prosecutor asked how that experience would "affect your ability to sit and listen to the evidence," Juror #11 responded, "It possibly could. I am not sure I could be fair depending on what I would hear." (*Id.*) The prosecutor then asked, "In what way?" (*Id.*) Juror #11 replied, "If certain circumstances were like what I have heard before.  . . . And what I have had to deal with, police and Child Protective Services." (*Id.*)

The prosecutor then asked Juror #11, "Okay. This Defendant sitting here, he has not been involved in anything you were involved in, correct?" (*Id.*) Juror #11 responded, "Yes." (*Id.*) However, when the prosecutor asked Juror #11 if she would hold those experiences against Petitioner, Juror #11 responded, "I am not sure. I am also a victim." (*Id.*) When asked, Juror #11 indicated she had been a victim 62 years ago. (*Id.*) The prosecutor asked, "So you are not sure if you can sit and listen to the evidence in this case?" (*Id.*) Juror #11 responded, "That's true." (*Id.*)

Later on, defense counsel engaged in the following colloquy with Juror #4:

MS. BUCHANAN: Juror No. 4, you mentioned earlier that you have had a personal experience but you said that you still thought you could be a good juror?

JUROR #4: Yes.

MS. BUCHANAN: Can you just tell me what makes you think that you could still be a good juror for this case?

JUROR #4: Cause I know, like, percentage I know his mind-set and every mind is different, and he's like, mentally had problems, so I see where he's coming at personally to me. So I can see, like—it's hard to explain.

MS. BUCHANAN: Okay. So when you came in here today, did you feel like Mr. Townsend must have done something wrong?

25

JUROR #4: To be honest, when I walked in I like, why is all these people standing up? That's what my thought was.

MS. BUCHANAN: Why we are all standing for you?

JUROR #4: Yeah.

MS. BUCHANAN: Okay. And now having heard a little bit more about the case Ms. Johnson is presenting I guess, what is going through your mind? Are you assuming he must have done something?

JUROR #4: 50/50. But I won't know until, like, hear, like evidence and people saying some stuff.

MS. BUCHANAN: Can you start with the presumption that he didn't do it?

JUROR #4: Yes.

MS. BUCHANAN: And if you get to the end of the case and you can't decide who is telling you the truth about what happened, what do you do then?

JUROR #4: That's tough. I would have to, like, replay the evidence in my head and really think about it.

MS. BUCHANAN: You don't know any of the people who are named as witnesses in this case, right?

JUROR #4: No.

MS. BUCHANAN: Okay. So you can't start with we know what Bob always says or whatever. So if you get to the end of the case and you still feel uncertain about what really happened that day, has the Prosecutor proven the case beyond a reasonable doubt to you?

JUROR #4: I don't know.

(*Id.*, PageID.275–276.)

Subsequently, the following colloquy regarding Juror #11 occurred:

MS. JOHNSON: Judge, I did have one more cause challenge.

THE COURT: I'm sorry. I apologize.

MS. JOHNSON: Juror No. 11, under my questioning, indicated that she could not set aside—was not sure she could set aside her experiences and listen to this evidence.

26

THE COURT: Is that right?

JUROR #11: Especially if it would involve children, not adults.

THE COURT: But there is no children here. But here is the bigger question. These are experiences as a professional—

JUROR #11: Yes.

THE COURT: --that you have dealt with? Not personal experiences?

JUROR #11: With children.

THE COURT: Yeah. So here is my question. You will be getting instructions from me on the law of this case. We do not have children involved like I have had in many other cases.

JUROR #11: Then I'm fine.

THE COURT: You are fine then?

JUROR #11: Yes.

THE COURT: Does that help you out, Ms. Johnson?

MS. JOHNSON: Yes, Judge. I would withdraw my challenge.

(*Id.*, PageID.277.) Ultimately, Jurors #4 and #11 ended up on Petitioner's jury panel.

Here, Petitioner suggests that the trial court should have held a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), because of a prima facie case of juror bias. (§ 2254 Pet., ECF No. 1, PageID.23.) Petitioner argues that "[i]t is clear from the record that Juror[] #4 and Juror #11 may have submerged bias towards Petitioner due to the nature of his alleged criminal act." (*Id.*)

In *Remmer*, the Supreme Court held that a prima facia showing of juror bias, such as an allegation of "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury" entitles the defendant to a hearing on such bias. *Remmer*, 347 U.S. at 229. The Sixth Circuit has noted that a *Remmer* hearing is required

when there is a claim of extraneous influence, which the Sixth Circuit has defined as "one derived from specific knowledge about or a relationship with either the parties or their witnesses." *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007) (quoting *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998)). Here, Petitioner offers no evidence suggesting that Jurors #4 and #11 were affected by extraneous influences, and so the Court cannot agree with Petitioner that the trial court erred by failing to conduct a *Remmer* hearing.

Moreover, Petitioner's suggestion that Jurors #4 and #11 may have had "submerged bias" is solely based upon speculation and is not supported by any record evidence. As set forth above, Juror #11 explicitly stated that she would be "fine" after the trial court reassured her that Petitioner's case did not involve any sexual abuse of children. Although Juror #11 indicated that she herself had been a victim of sexual assault more than 60 years before Petitioner's trial, at no time did she make any statements suggesting that her status as a victim would affect her ability to be impartial in Petitioner's case.

With respect to Juror #4, the Court recognizes that, based upon the colloquies set forth above, Juror #4 did appear to have expressed some doubt as to her own impartiality given her status as a victim. However, as noted above, that alone "does not necessarily entail a finding of actual bias." *Hughes*, 258 F.3d at 458 (citing *Patton*, 467 U.S. 1032). Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. At no time did Juror #4 explicitly state that she would be unable to do so, and Petitioner had provided no evidence suggesting otherwise.

Upon consideration of the record, the Court cannot agree with Petitioner that Jurors #4 and #11 demonstrated actual bias to the point that Petitioner is in custody in violation of his

28

constitutional rights because of a biased jury. Accordingly, Petitioner is not entitled to relief with respect to this portion of ground I.

In sum, Petitioner has not demonstrated that the state courts' rejection of his judicial bias claim was contrary to, or an unreasonable application of, clearly established federal law. Moreover, Petitioner has failed to demonstrate that his jury was actually biased against him. Accordingly, Petitioner is not entitled to relief with respect to ground I.

**B.    Ground II—Ineffective Assistance of Trial and Appellate Counsel**

As his second ground for relief, Petitioner contends that trial counsel was constitutionally ineffective, and that appellate counsel was "deficient for failing to raise [a] claim against [Petitioner's] trial attorney's failure to fully investigate the case and assert a valid defense to the charge of rape where evidence supported his defense of actual innocence." (§ 2254 Pet., ECF No. 1, PageID.5.) Petitioner raised some, but not all, of his claims regarding counsel's alleged ineffectiveness in the Rule 6.500 motion he filed in May of 2020; however, as noted above, the trial court never addressed the merits of these claims. The Court, therefore, will conduct a *de novo* review of Petitioner's claims. *See Stermer*, 959 F.3d at 721 (citing *Maples*, 340 F.3d at 436).

**1.    Standard of Review**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

### 2.    Ineffective Assistance of Trial Counsel

Within ground II, Petitioner raises four subclaims of ineffective assistance of trial counsel. The Court considers each in turn below.

### a.   Failure to Investigate

Petitioner first faults trial counsel for not adequately investigating his case. (§ 2254 Pet., ECF No. 1, PageID.27.) He suggests that counsel 'did not have the investigator conduct interviews with audio specialists, nor investigate the theory of 'role playing' during a sexual encounter." (*Id.*) Petitioner faults counsel for allowing prosecution witness Nurse Kasper to testify that the victim "indicated to h[im] that the normal sex act was consensual, but the anal penetration was not consensual." (*Id.*) Petitioner suggests that counsel had no defense to this testimony, nor did she have any defense to Sergeant Horan's testimony indicating that Petitioner had told him that he and the victim "did not have a safe word." (*Id.*) According to Petitioner, counsel "was unprepared for this testimonial exchange with supporting evidence from the private investigator, or an expert on the missing audio taping of the sexual encounter." (*Id.*)

First, as discussed *infra* in Part III.B.2.d, the Court has concluded that Petitioner has failed to demonstrate that counsel was ineffective for failing to call an expert to testify regarding audio recordings. Moreover, Petitioner provides no supporting allegations for what evidence he believes the private investigator should have gathered on counsel's behalf. To the extent that Petitioner faults counsel for not having the investigator pursue "role playing," the court of appeals concluded that the trial court properly excluded evidence "that role-playing had occurred in the past, holding that unless such evidence was presented that role playing had occurred during the act in question, evidence of prior role-playing was irrelevant." *Townsend*, 2018 WL 6815958, at *8. In light of that ruling, it would have been futile for defense counsel to pursue that theory.

Furthermore, the record reflects that counsel thoroughly cross-examined Nurse Kasper and was able to have him admit that the injuries he described from the photographs of the victim could also occur during consensual anal sex. (Trial Tr. II, ECF No. 7-10, PageID.347.) To the extent that

31

Petitioner believes counsel should have objected to Nurse Kasper's testimony regarding what the victim told him during the examination, the Sixth Circuit has held that such statements are not testimonial, and, therefore, do not violate the Sixth Amendment's Confrontation Clause. *See Dorsey v. Cook*, 677 F. App'x 265, 267 (6th Cir. 2017). Any objection by counsel on that basis would have been futile.

Likewise, during her cross-examination of Sergeant Horan, counsel had Sergeant Horan admit that not everything that Petitioner told him during the interview made it onto the list of facts drafted by Sergeant Horan. (Trial Tr. II, ECF No. 7-10, PageID.354.) Counsel also had Sergeant Horan admit that the entire interview was not recorded. (*Id.*, PageID.355.) Although counsel did not ask Sergeant Horan any questions about the lack of a "safe word," Petitioner fails to demonstrate how counsel's failure to do so prejudiced his defense in any way.

In any event, counsel attempted to refute the testimony provided by the prosecution's witnesses by calling Petitioner to the stand. Petitioner testified that the victim was the one who introduced the idea of anal sex. (*Id.*, PageID.359.) When asked why the recording did not contain a statement by the victim raising the subject, Petitioner suggested that there was audio missing and that the victim had her phone in her hand at the time. (*Id.*) Petitioner testified that the phone slipped out of the victim's hand at one point. (*Id.*, PageID.360.) Moreover, Petitioner explained that the victim using words like "don't" and "stop" was "just part of the sex game." (*Id.*, PageID.361.)

In sum, Petitioner fails to demonstrate that counsel was ineffective in the ways he suggests that she failed to investigate his case. The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel's pursuit of it was professionally unreasonable. Petitioner, therefore, is not entitled to habeas relief with respect to this assertion of ineffective assistance.

### b.      Failure to Utilize Evidence

Second, Petitioner faults counsel for "fail[ing] to utilize the recording in her possession[] to inform the jury that the tape played to them had been altered from its original form, which is why 16 seconds of audio was missing." (§ 2254 Pet., ECF No. 1, PageID.27–28.) According to Petitioner, those missing seconds account for where the victim "initiated the concept of 'anal sex.'" (*Id.*)

To the extent that Petitioner suggests that counsel had an unaltered copy of the recording and failed to utilize it at trial, Petitioner's assertion is supported by nothing more than speculation. He fails to point to any evidence suggesting that counsel had an unaltered copy of the recording in question. Moreover, as discussed *supra* and *infra*, Petitioner himself testified that the victim initiating the idea was missing from the recording, and defense counsel cross-examined Detective Roudebush regarding the recording. Petitioner fails to explain, and the Court fails to discern, how counsel's failure to utilize this alleged evidence at trial prejudiced his defense in any way. Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of trial counsel.

### c.      Failure to Request Expert Regarding Audio Recordings

Next, Petitioner faults counsel for not moving the trial court for "additional funds for an expert in the field of audio communications." (§ 2254 Pet., ECF No. 1, PageID.29.) Petitioner suggests that an expert "could have explained the difference between the available audio and the missing 16 seconds of the audio, or could have informed the jury that this missing audio was purposely erased from the audio recording which may have created a reasonable doubt as to Petitioner's guilt of 'rape.'" (*Id.*) Again, Petitioner believes that the missing 16 seconds would have indicated that the victim "initiated the conversation regarding anal sex." (*Id.*)

33

The Supreme Court has recognized that "[t]he selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after a thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting *Strickland*, 466 U.S. at 690). Here, there is no record evidence suggesting that Petitioner's counsel did not investigate the possibility of obtaining expert testimony regarding audio recordings. Absent such support, Petitioner cannot overcome the presumption that counsel's actions fell within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

In any event, Petitioner fails to offer support for his belief that an expert existed who was willing to testify and whose testimony would have been favorable to Petitioner's defense. Without some record support for Petitioner's contention, it is impossible for Petitioner to show that his counsel was professionally unreasonable for failing to pursue such expert testimony or that it made any difference in the result. "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (6th Cir. 1991) (footnote omitted); *see also Lagrone v. Parris*, No. 23-5177, 2023 WL 5623279, at *4 (6th Cir. Aug. 7, 2023) ("Lagrone did not identify an expert his trial counsel could have called or indicate what an expert could have testified that would have been relevant to his defense. The speculative impact of expert testimony is not enough to prove prejudice under *Strickland*."); *Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) (stating that "[t]he salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.").

Furthermore, the record reflects that defense counsel adequately cross-examined Detective Jerry Roundebush, the officer who extracted the recording from the victim's cell phone, regarding

the missing 16 seconds. On cross-examination, counsel was able to have Detective Roundebush confirm that his report stated that the recording he recovered "is 17 minutes, 20 seconds in length." (Trial Tr. I, ECF No. 7-8, PageID.323.) Detective Roundebush testified that he did not delete anything or make the file shorter in any way. (*Id.*) Counsel then noted that the file was time-stamped "7:51:19 to 8:08:56, that's actually 17 minutes, 37 seconds, right?" (*Id.*) Detective Roundebush agreed. (*Id.*) Detective Roundebush agreed that was "16 seconds longer than the actual length of that recording." (*Id.*)

In light of that cross-examination, Petitioner fails to assert what more an expert regarding audio recordings could have added to the defense strategy. Although Petitioner suggests that an expert could have explained the difference between the available audio and the missing 16 seconds, Petitioner provides no evidence to suggest what that explanation would have been or that the expert would have been able to recover that missing 16 seconds at all. Given the victim's testimony against Petitioner, Petitioner fails to demonstrate that any expert testimony would have changed the outcome of his trial in any way. *See Tucker v. Palmer*, 541 F.3d 652, 658 (6th Cir. 2008) (noting that the Sixth Circuit has "long held that the testimony of the victim alone is constitutionally sufficient to sustain a conviction"); *see also United States v. Howard*, 218 F.3d 556, 565 (6th Cir. 2000) (noting that "testimony of a rape victim alone is sufficient to support a defendant's conviction"). Accordingly, for the reasons set forth above, Petitioner is not entitled to relief with respect to this assertion of ineffective assistance of trial counsel.

### d.    Failure to Request Recusal Due to Judicial Bias

Finally, Petitioner faults trial counsel for failing "to request recusal from the trial judge when he ignored his former ruling regarding [t]he motion to allow certain evidence into the trial." (§ 2254 Pet., ECF No. 1, PageID.30.) According to Petitioner, the trial judge "implied the evidence

could come in if Petitioner took the stand to testify." (*Id.*) However, when Petitioner did take the stand, "the evidence [counsel] sought to get on the record[] w[as] prohibited by the Judge ignoring his former ruling, and he berated [counsel] for her attempt to renew her motion." (*Id.*)

As discussed *supra*, the Court has concluded that Petitioner's allegations of judicial bias do not rise to the level of a due process violation. The Court, therefore, cannot agree with Petitioner that counsel's failure to request recusal on this basis prejudiced his defense in any way. *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."); *see also Coley*, 706 F.3d at 752 (noting that "omitting meritless arguments is neither professionally unreasonable nor prejudicial"). Petitioner, therefore, is not entitled to relief with respect to this assertion of ineffective assistance of trial counsel.

### 3.    Ineffective Assistance of Appellate Counsel

Petitioner faults appellate counsel for "fail[ing] to assert a claim of the juror bias or partiality" on direct appeal. (§ 2254 Pet., ECF No. 1, PageID.32.) Petitioner also argues that appellate counsel was ineffective for failing to raise claims regarding trial counsel's ineffectiveness. (*Id.*, PageID.33.) Particularly, Petitioner believes that appellate counsel should have requested a remand "to conduct a hearing on trial counsel's failure to challenge the missing audio from the recordings played to the jury." (*Id.*) He also suggests that appellate counsel should have argued that trial counsel was ineffective for failing "to move for additional expenses for an expert to examine the CD recording to determine the true nature of the missing 16 seconds." (*Id.*)

As discussed *supra*, Petitioner's juror bias claim lacks merit, as do his claims of ineffective assistance of trial counsel. Thus, appellate counsel's decision not to raise these claims on direct appeal "cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("If trial counsel

performed adequately, our inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Petitioner, therefore, is not entitled to relief with respect to his claim that appellate counsel rendered ineffective assistance.

In sum, Petitioner has not demonstrated that trial and appellate counsel were ineffective in the ways that he asserts. Petitioner, therefore, is not entitled to relief with respect to ground II.

### C.    Ground III—Actual Innocence

As his third and final ground for relief, Petitioner contends that the facts of the case "demonstrate his actual innocence and but for the Sixth Amendment violations of judicial bias and ineffective assistance of counsel, no juror would have voted to convict him of rape. (§ 2254 Pet., ECF No. 1, PageID.5.) Petitioner raised a claim of actual innocence in the Rule 6.500 motion he filed in June of 2020, but as noted above, the trial court denied that motion on March 22, 2022. (ECF No. 7-15.)

To the extent Petitioner is attempting to assert a claim of actual innocence premised upon newly discovered evidence, he fails to state a cognizable federal claim. The Supreme Court has stated: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). But the *Herrera* Court did not close the door completely, stating in dicta that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas

37

petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d);

*Williams*, 529 U.S. at 412. Recently, the Sixth Circuit acknowledged that the actual innocence "equitable-exception [to the AEDPA statute of limitations] doctrine is not a freestanding substantive claim for habeas relief. The Supreme Court has not decided whether actual innocence is a substantive ground for relief." *Hubbard v. Rewerts*, 98 F.4th 736, 742 (6th Cir. 2024); *see also Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (citing *Schlup* and *Herrera* for the proposition that freestanding claims of actual innocence are not cognizable on habeas corpus review); *Cress*, 484 F.3d at 854 (citing cases for the same proposition). Accordingly, in the absence of clearly established Supreme Court precedent establishing a freestanding claim of actual innocence, Petitioner's claim is without merit. Even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and, thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Accordingly, for the reasons set forth above, Petitioner is not entitled to relief with respect to habeas ground III.

**IV.    Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine

whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter an Order and Judgment denying the § 2254 petition as well as a certificate of appealability.


Dated:     January 16, 2025                     /s/ Jane M. Beckering
                                                Jane M. Beckering
                                                United States District Judge